**AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT**

I, Michael T. Higgins, being duly sworn, state the following:

**<u>Introduction</u>**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since January 2013.  From 2013 through October 2018, I was assigned to the Laredo District Office, Houston Field Division on the Southwest Border of the United States. Since November 2018, I have been assigned to the New England Field Division, Boston Division Office.  I am currently assigned to the Financial Investigations Group.  Prior to my employment with the DEA, I was employed by Electric Insurance Company in Beverly, Massachusetts.

3.      As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of 21 U.S.C. § 846 (attempt to possess with intent to distribute and to distribute controlled substances).  I have received training regarding narcotics investigations while attending the DEA Basic Agent Training in Quantico, Virginia and additional specialized training courses.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I am familiar with the benefits and limitations of these techniques.   I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I

1

have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.      By virtue of my employment as a DEA Special Agent, I have performed and continue to perform various duties, including, but not limited to working in an undercover capacity principally for the purpose of purchasing drug evidence; working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

6.      Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity.  I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.

7.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, pager messages, and other means to facilitate their illegal activities.

**Purposes of Affidavit**

8.    I submit this affidavit in support of the following:

    a.    An application for a criminal complaint against Jesus Arley MUNERA-Gomez

       for violation of 21 U.S.C. § 846 (attempt to possess with intent to distribute and to

       distribute five kilograms or more of cocaine) (the "Target Offense");

    b.    An application for a search warrant to search 370 Ocean Avenue, Apartment 202,

       Revere, Massachusetts  (the "Target Location")

9.    Based on the facts set forth in this affidavit, there is probable cause to believe that

MUNERA-Gomez has committed the Target Offense and that evidence of the commission of the

Target Offense will be located at the Target Location.

10.    I am a DEA Special Agent and have assisted with this investigation and have

worked closely with other DEA Special Agents and law enforcement personnel.  Accordingly, I

am familiar with the facts concerning this investigation.  The facts in this affidavit come from

my personal observations, my training and experience, and information obtained from other

agents and witnesses.  This affidavit is intended to show that there is probable cause for the

criminal complaint and does not set forth all of my knowledge about this matter.

**Probable Cause**

11.    On October 10, 2019, a confidential source[1] (hereinafter the "CS") contacted law

enforcement and identified a Colombian male known as "Picachu," who was later positively

---

[1] CS is cooperating with DEA in hopes that CS will receive consideration in connection with criminal charges and/or sentencing related to the seizure of multiple kilograms of cocaine and hundreds of thousands of dollars from his stash house in February 2019. CS has no other known criminal history. CS has provided detailed information about his co-conspirators in his cocaine trafficking, which has been corroborated to the extent possible by investigators. CS has also cooperated proactively against several individuals, and is believed to be reliable.

identified as Jesus Arley MUNERA-Gomez as set forth below.  MUNERA-Gomez told the CS

he was ready to sit down with the CS and discuss "business," referring to buying and selling

cocaine.

**October 23, 2019 – MUNERA-Gomez meets with the CS to discuss buying
approximately $100,000 worth of cocaine**

12.     On October 23, 2019, Special Agents (SA) and Task Force Officers (TFO)

directed the CS to contact MUNERA-Gomez and schedule a meeting.  At the direction and under

the supervision of agents, CS contacted MUNERA-Gomez and arranged to meet later the same

day.  Later that day, the CS met agents at a pre-determined location in advance of the planned

meeting with MUNERA-Gomez.  Agents searched the CS and CS's vehicle for contraband and

excessive amounts of currency with negative results.  The CS was then equipped with an

audio/video recording device.

13.     The CS left the pre-determined location and, as arranged with MUNERA-Gomez,

at approximately 12:06 p.m., the CS arrived at El Penol 2 Restaurant in Revere.  Surveillance

officers observed the meeting between CS and MUNERA-Gomez.  Inside the restaurant, the CS

met with MUNERA-Gomez and his associate, whom the CS knew as  "Nelson."  During the

meeting, which was conducted in Spanish,[2] the CS told MUNERA-Gomez that the CS was

trying to get back into selling cocaine again, and asked MUNERA-Gomez about recent cocaine

prices.  MUNERA-Gomez told the CS that he is getting 20-25 kilograms a month from a

Mexican Source of Supply (SOS) in California for $31,000 each.  MUNERA-Gomez explained

to the CS that MUNERA-Gomez is getting the kilograms delivered to him by the SOS, but is

---

[2] For the conversations described throughout the affidavit, agents debriefed the CS after the
meeting.  The CS explained the content of the meeting and the agreement between the parties
therein.  Additionally, a Spanish-speaking agent listened to the recordings after the meetings and
verified contents.  Translations have not yet been prepared.

currently looking to get his own driver to lower the costs.  The CS told MUNERA-Gomez that

the CS might be able to get a shipment of 40-50 kilograms and asked if MUNERA-Gomez

would invest in the shipment. MUNERA-Gomez told the CS that he would give the CS

$100,000-$200,000 for the transport of the shipment, but that he would need time to get the

money together.  MUNERA-Gomez informed the CS that business is bad and that he needs a

new drug connect.  MUNERA-Gomez then told the CS that he wants to introduce the CS to the

new guy he (MUNERA-Gomez) works with.

14.     At approximately 12:45 p.m., surveillance officers observed the CS, MUNERA-

Gomez and NELSON leave the restaurant.  The CS drove back to the pre-determined location

and met the agents.  The CS and the CS's vehicle was searched by agents, with negative results.

The audio/video recording device was removed from the CS.

<u>November 4, 2019 – Agents identify MUNERA-Gomez during a vehicle stop and later</u>
<u>see MUNERA-Gomez enter the apartment complex containing the Target Location</u>

15.     On November 4, 2019, law enforcement officers conducted surveillance in the

area of Billiards Colombia, 28 Bennington Street, East Boston, Massachusetts, and La Terraza,

19 Bennington Street, East Boston, MA, locations where MUNERA-Gomez is known to

frequent. At approximately 1:55 a.m., MUNERA-Gomez was observed exiting La Terraza,

crossing Bennington Street and entering a gray Toyota Sienna van.  The vehicle then exited the

parking lot and began travelling on Bennington Street.  At approximately 2:00 a.m., law

enforcement officers effected a motor vehicle stop of the Sienna on Bennington Street. BPD

Officers identified the driver via his Colombian passport and the passenger as Jesus Arley

MUNERA-Gomez via his Colombian passport.

<u>November 7, 2019 – MUNERA-Gomez meets with the CS to discuss
details of cocaine deal</u>

16.     On November 7, 2019, law enforcement officers directed the CS to contact

MUNERA-Gomez and schedule a meeting.  Later that day, the CS met agents at a pre-

determined location.  Agents searched the CS and CS's vehicle for contraband and excessive

amounts of currency with negative results.  The CS was then equipped with an audio/video

recording device.

17.     The CS left the pre-determined location and met with MUNERA-Gomez at

Adriana's Café, 19 Main Street, Winthrop, Massachusetts, as arranged by them.  Specifically, at

approximately 1:37 p.m., the CS arrived at Adriana's Café, parked, went inside, and sat down at

a table.  At approximately 1:40 p.m., law enforcement officers saw MUNERA-Gomez exit the

passenger-side of a Nissan Rogue and enter the café.  When MUNERA-Gomez entered

Adriana's Café, he went to the CS' table and sat down with the CS.  The CS told MUNERA-

Gomez that the CS was getting a shipment of 100 kilograms of cocaine by mid-December and

asked MUNERA-Gomez if he wanted to invest in the shipment.  MUNERA-Gomez told the CS

that he did want to invest in the shipment, and went on to say that he is currently purchasing

kilograms of cocaine for $29,500 per kilogram and selling them for $31,500 per kilogram.  The

CS then told MUNERA-Gomez that the CS would sell them to him (MUNERA-Gomez) for

$28,000 per kilogram.  The CS then told MUNERA-Gomez that there would be "no pressure"

and that he (MUNERA-Gomez) can pay the CS back as he sells the cocaine. The CS told

MUNERA-Gomez there would be no rush and that the CS would send small amounts of money

back to Colombia.  The CS asked MUNERA-Gomez if he wanted to buy all 100 kilograms and

MUNERA-Gomez said "yes."  MUNERA-Gomez told the CS that he wanted bricks (rectangular

kilograms) and not "round ones" because people do not like them. MUNERA-Gomez stated that

people think the round ones have been cut and repackaged, and he (MUNERA-Gomez) wanted

to be able to sell them quickly.  The CS told MUNERA-Gomez that the kilograms will be bricks.

The CS told MUNERA-Gomez that the CS would need money in advance to pay for transport

from Colombia to Boston. MUNERA-Gomez told the CS that he could give the CS $150,000 to

$200,000 in advance for the shipment and to let him know a week in advance so he can collect

the money.  MUNERA-Gomez told the CS that he would expect the shipment within 15 days of

him paying the CS.  The CS and MUNERA-Gomez shook hands and left the restaurant.

18.     After leaving the restaurant, the CS drove back to the pre-determined meet

location.  Agents searched the CS and CS's vehicle with negative results and the audio/video

recording device was removed from the CS.

<u>January and February, 2020 – MUNERA-Gomez confirms 20 kilogram cocaine order and
confirms that he resides at the Target Location</u>

19.     On January 21, 2020, agents directed the CS to contact MUNERA-Gomez and

schedule a follow up meeting.  Later that day, the CS met agents at a pre-determined location.

Agents searched the CS and CS's vehicle for contraband and excessive amounts of currency with

negative results.  The CS was then equipped with an audio/video recording device.  The CS then

left the pre-determined location and met with MUNERA-Gomez at Belle Isle Seafood and

Restaurant, located at 1 Main Street, Winthrop, Massachusetts.  During the meeting, the CS told

MUNERA-Gomez that the shipment of cocaine would be arriving in Boston in mid-February

and that the CS would need to know how much of the 100 kilogram shipment MUNERA-Gomez

wanted to purchase.  MUNERA-Gomez told the CS that it would depend on how much the CS

was charging per kilogram. MUNERA-Gomez told the CS that he (MUNERA-Gomez) was

purchasing kilograms of cocaine for $28,000 and selling them for $30,500 right now. The CS

told MUNERA-Gomez that the CS could sell MUNERA-Gomez kilograms for $27,500 per

kilogram. MUNERA-Gomez agreed to this price and told the CS that he would purchase 20 kilograms of this shipment and 20 kilograms of the next shipment. The CS told MUNERA-Gomez that the CS would need MUNERA-Gomez to deliver $150,000 to $200,000 within the next week or two. MUNERA-Gomez told the CS that this was not a problem.

20.     After the meeting, the CS went to the CS's vehicle and drove back to the pre-determined neutral location where the CS met the agents and the CS and CS's vehicle was searched with negative results.  The audio/video recording device was removed from the CS. After leaving the restaurant, MUNERA-Gomez entered the Chevrolet Equinox he arrived in, and left the area. At approximately 1:50 PM, the Equinox was observed parked in the area of Waters Edge Apartment Complex in Revere, Massachusetts. MUNERA-Gomez was observed exiting the Equinox carrying a cup and brown paper bag. MUNERA-Gomez was observed walking on Ocean Ave looking at traffic. MUNERA-Gomez was then observed walking towards the Target Location building.

21.     On February 12, 2020, at the direction of agents, the CS met with MUNERA-Gomez to discuss MUNERA-Gomez purchasing twenty kilograms of cocaine from the CS. During the meeting, two undercover investigators ("UCs") drove to the meet location and conducted a surprise flash of ten bundles of sham kilograms (representing 20 kilograms of cocaine) to MUNERA-Gomez.  After showing MUNERA-Gomez the sham kilograms, the two undercover investigators left the area.  MUNERA-Gomez told the CS that he wanted to purchase the kilograms, but disagreed with the proposed meeting location.  MUNERA-Gomez told the CS that he wanted the CS to deliver the kilograms to MUNERA-Gomez's home. MUNERA-Gomez told the CS that he lived by the ocean in Revere, in the tall apartment building to the right of Banana Boat (Banana Boat and ice cream is located on Ocean Avenue, at the corner of Beach

Street, to the left of 364/370 Ocean Avenue). MUNERA-Gomez told the CS that he lived on the second floor of the left side building (When looking at 364/370 Ocean Avenue, the tower to the left is 364 and the tower to the right is 370. The two buildings are connected by a low rise section of the building in the middle).

<u>February 13, 2020 - MUNERA-Gomez picks up 20 sham kilograms of cocaine from CS and is arrested</u>

22.     On February 13, 2020, at approximately 11:40 a.m., agents met with the CS at a pre-determined location in preparation for conducting a controlled delivery of 20 sham kilograms of cocaine to MUNERA-Gomez.  Agents searched the CS and CS's vehicle for contraband and excessive amounts of currency with negative results.  The CS was then equipped with an audio/video recording device.  At approximately 12:19 p.m., the CS arrived outside of the Target Location and called MUNERA-Gomez to arrange for the transaction.  During a number of calls back and forth, MUNERA-Gomez and the CS discussed the details of the transaction and where it would take place.  Specifically, MUNERA-Gomez did not want to leave his residence.  At approximately 12:30 p.m., MUNERA-Gomez requested that the CS come to the Target Location so that MUNERA-Gomez could show the CS that he had the money.  Thereafter, the CS entered the Target Location at the request of MUNERA-Gomez.  During the meeting within the Target Location, MUNERA-Gomez showed the CS bundles of U.S. currency in a suitcase.  MUNERA-Gomez said that the suitcase contained $200,000.  The CS then left the Target Location.

23.     After additional negotiations between MUNERA-Gomez and the CS, it was eventually agreed that the transaction would occur in the lobby of the Target Location building.  Specifically, MUNERA-Gomez would take possession of the (sham) cocaine in the lobby and then go back to the Target Location and retrieve the $200,000 to pay the CS.  At approximately 1:15 p.m., two UCs picked up the CS and drove to the lobby of the Target Location.  The CS and

9

the two UCs entered the lobby and met with MUNERA-Gomez.  The UCs opened the bag

containing the sham kilograms of cocaine and showed it to MUNERA-GOMEZ.  After he saw

the inside of the bag containing the sham kilograms, MUNERA-GOMEZ took the duffle bag

from the UCs and walked into a stairwell adjacent to the lobby.  While MUNERA-Gomez was

walking away, one of the UCs asked MUNERA-Gomez if the money was in order.  MUNERA-

Gomez responded that it was, and that his man (meaning the CS) had inspected it.  Thereafter,

MUNERA-Gomez entered the stairwell and was arrested by law enforcement.

24.     Based upon my experience and the experience of other law enforcement officers

who have participated in the execution of numerous search warrants at residences used by money

launderers and drug traffickers, I am aware that the following kinds of evidence have typically

been recovered from searches of such residences:

   a.     Books, records, receipts, notes, ledgers, and other papers relating to the
   collection and laundering of money, personal telephone/address books, electronic
   organizers, telephone bills, bank and financial records, and storage records, such as
   storage locker receipts and safety deposit box rental records and keys.

   b.     Items of personal property that tend to identify the person(s) in residence,
   occupancy, control, or ownership of the subject premises.  Such identification evidence
   is typical of the articles people commonly maintain in their residences, such as canceled
   mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries,
   utility and telephone bills, bank statements, credit card receipts, identification documents,
   and keys.

   c.     Cash, currency, and currency counting machines, and records relating to
   controlled substances income and financial transactions relating to obtaining, transferring,
   laundering, concealing, or expending money or other items of value made or derived from
   trafficking in controlled substances.  Such items include, but are not limited to, jewelry;
   precious metals such as gold and silver; precious gems such as diamonds; titles; deeds;
   monetary notes; registrations; purchase or sales invoices; and bank records.

   d.     Documents or tangible evidence reflecting dominion, ownership, and/or
   control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any
   other financial and/or monetary assets, instruments or interests, and over any tangible
   assets such as motor vehicles, real property, and commercial storage facilities.

   e.     Photographs, videos, or other records concerning the origination of bulk

cash or the identities of coconspirators.

       f.     Cellular telephones owned or used by occupants.

25.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in residences used by them records relating to their drug trafficking and money laundering activities. Record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Additionally, drug traffickers must maintain telephone, email, and address listings of clients and brokers and keep them immediately available in order to efficiently conduct their money laundering business. I am also aware that drug traffickers often maintain such documents related to their activities at the residences for an extended period of time.

26.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders. Drug traffickers also often maintain one or more currency counting machines to aid in counting bulk cash. Evidence of financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking is also typically maintained.

27.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking activities in safes or other containers so that other individuals do not discover these materials.

28.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offense. Such identification evidence

is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, I have learned from this and other investigations that records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in drug trafficking is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books and bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

29.     Based on training and experience, I know that most drug traffickers regularly use cellular telephones to communicate about their drug trafficking activities with customers, couriers, and other coconspirators.   In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.   Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity.  Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in residences maintained by them. As a result, it is common to recover not only paper records pertaining to the use of the cellular phone by drug traffickers, such as bills, call detail records, statements, and other documents, but

the cellular telephones themselves, from residences maintained by money launderers.

30.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

31.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who distribute drugs typically use cellular telephones to communicate with their customers, their couriers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell drugs regularly keep records of their illegal activities.  Records of drug traffickers can be produced and maintained on paper in a tangible form and/or by electronic means on cellular telephone, electronic/digital storage device and/or a computer.  In the case of

electronic or digital media, the information can be maintained on the device itself or on portable digital storage media, making it easier to conceal.  I know that individuals involved in drug traffickers are very secretive in their activity in an effort to avoid detection, arrest and prosecution, and such persons usually are careful to deal only with someone they know, or who have been introduced to them by someone they know.  Additionally, in the conduct of their activities, they frequently employ code words or colloquial jargon when writing, texting or speaking on the telephone or in person, being careful to avoid the use of actual names of persons or narcotic substances, which, if overheard or seen, would be incriminating to themselves or their criminal associates.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B on their cellular telephones.

32.     I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking and/or money laundering; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers maintain bank accounts and conceal their proceeds.

33.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular

telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.   It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser

on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

34.     Based on my training and experience, and the experience of other law enforcement officers who have participated in the execution of numerous search warrants, including participation in other drug investigations and extensive discussions with other law enforcement officials experienced in controlled substances investigations, I am also aware that it is common practice for drug traffickers to store drug-related paraphernalia, records, and documents necessary for drug trafficking operations in secure yet accessible locations such as their residences, places of business, and stash houses for longer periods of time than they keep drugs.  I have participated in the execution of search warrants of the residences of drug traffickers whose criminal activity is similar to that of MUNERA-Gomez.   In the searches executed at residences and stash houses in connection with the drug investigations in which I have been involved, investigators typically recover drug-related evidence including cash, records, documents, drug distribution materials, drugs, and other valuable items.  Based on my training and experience, I believe that:

      a.     Drug traffickers generally store their drug inventory, drug paraphernalia, drug proceeds, and drug records at or in their residences, businesses, drug stash houses, and/or vehicles;

      b.     Drug traffickers will also generally seek to store their drug inventory, drug paraphernalia, drug proceeds, and drug records in the residences, businesses, and/or vehicles of relatives, trusted associates, or others in an effort to distance themselves from the drugs they are selling and to shield themselves from detection by law enforcement, or by setting up what is commonly referred to as a "stash house," typically a residence or commercial location registered in the name of others and used to store drugs or to prepare drugs for distribution;

      c.     Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside of the normal banking system.  Accordingly, drug traffickers frequently maintain large amounts of cash and other

16

valuable assets at their residences, businesses, stash houses, or vehicles, in order to maintain and finance their ongoing business, and often keep one or more currency counting machines to aid in counting drug proceeds.  Drug traffickers also often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering is also generally maintained in the residences, businesses, stash houses or vehicles of those involved in selling drugs or their relatives or trusted associates;

d.      Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances, and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passport and visas, and credit card receipts.  Such documents may be maintained in paper or electronic form, and are generally maintained where the drug traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

e.      It is common for drug dealers to secrete records of drug transactions in secure location within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

f.      It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to income from controlled substances and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, drug stash locations, or other locations over which

they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

g.      Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances.  Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cellular telephone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

h.      Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on the cellular telephone(s) and other electronic devices;

i.      Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residences or stash houses;

j.      Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

k.      Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cellular telephones, cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

l.      Drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at residences or drug stash houses.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been

retained;

m.      Drug traffickers often attempt to launder/legitimize the proceeds of illicit drug distribution and to otherwise conceal such proceeds from discovery by law enforcement.  To do so, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, stash houses, businesses, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

35.      Based on all of the evidence I have obtained in the course of this investigation, and for the reasons set forth above, I believe MUNERA-Gomez, like many drug traffickers, uses his residence and/or stash locations in furtherance of their ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Location.  *See e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[3]

---

[3] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)). As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

## CONCLUSION

36.     Wherefore, there is probable cause to believe MUNERA-Gomez has committed the Target Offense, and that evidence of the Target Offense will be located at the Target Location and that the items described in Attachments B, which constitute fruits, instrumentalities and/or evidence of these, violations are presently located inside the Target Locations, described in Attachment A.



Respectfully submitted,

Michael T. Higgins, Special Agent
Drug Enforcement Administration

Subscribed and sworn before me on February ____, 2020.
13th

Hon. M. Page Kelley
United States Magistrate Judge